IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| JOHN J. GAINEY; AND DONALD W. NUGENT,<br><br>  Plaintiff,<br><br>vs.<br><br>BLUECROSS BLUESHIELD OF SOUTH CAROLINA,<br><br>  Defendant. | Civil Action No. 3:09-986-JFA-JRM<br><br>**REPORT AND RECOMMENDATION** |

Plaintiffs John "Jay" J. Gainey ("Gainey") and Donald W. Nugent ("Nugent") filed this action on April 14, 2009. They allege claims for race and sex discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq., and a claim for defamation under South Carolina law.[1] Defendant is BlueCross and BlueShield of South Carolina ("BCBS"). On November 23, 2009, BCBS filed a motion for summary judgment. Plaintiffs filed a response on December 11, 2009, and BCBS filed a reply on January 11, 2010. On January 21, 2010, Plaintiffs filed a motion to strike; BCBS filed a response on February 8, 2010; and Plaintiffs filed a reply on February 15, 2010.

---

[1] Pretrial matters in this case were referred to the undersigned pursuant to Rule 73.02(B)(2)(g) DSC. Because these are dispositive motions, this report and recommendation is entered for review by the court.

## FACTS IN THE LIGHT MOST FAVORABLE TO PLAINTIFFS

1. Plaintiffs, both white males, were employed by BCBS in the Technology Support Center ("TSC") of the Information Systems ("I/S") Department. See Nugent Aff., Para. 3; Gainey Aff., Para. 3.

2. At the time of his termination, Nugent was the manager of the Internal Services Section of the TSC. Nugent's direct supervisor was Loretta Hazel ("Hazel"), a white female who was the Director of the TSC. Nugent Aff., Para. 3.

3. Gainey and Kortney Murray ("Murray"), a black female, were TSC Technical Support Analysts. They were chosen to become Team Leads in approximately September 2007. Gainey and Murray reported to Nugent. See Nugent Aff., Para. 3; Gainey Aff., Para. 3.

4. Plaintiffs and Murray became workplace friends and socialized occasionally outside of the workplace. Between September 2007 and January or early February 2008, the three exchanged hundreds of personal text messages from their personal cell phones. Some of the text messages included sexual banter or innuendo. Nugent Aff., Para. 4; Gainey Aff., Para. 4.

5. Nugent has submitted a list of times of "In" and "Out" messages to/from Murray. This log does not contain any of the actual messages, but reveals that the two sent/received over 2000 messages from October 2007 to February 2008. Nugent Aff., Ex. A

6. On November 7, 2007, Gainey received a written reprimand for inappropriate use of company messaging software. This was for an electronic message Gainey sent to a male co-worker

stating "don't act like a little b*&ch..." Plaintiffs' Responses to Defendant's First Request for Admissions ("Admissions")[2] Number 7; Nugent Aff., Para. 20.

7. On November 9, 2007, Hazel sent an email to all employees in her department regarding personal conduct in the workplace. Hazel Aff., Para. 5.[3]

8. On November 26, 2007, Nugent emailed his staff concerning cell phone usage. He wrote:

> This is a reminder that you should not be using your cell phone during your work hours. This also includes texting from your phones. If you have an emergency and have to make a call or take a call you should logout and step off the floor, make sure you let a team lead or manager know when this happens. I know this was covered in your training so if you have any questions please let me know.

Admissions Number 14, Ex. 8. Plaintiffs argue that this email did not apply to supervisors or team leads.

9. Hazel counseled Nugent at least three times from December 2007 to February 2008 about professionalism, including keeping distance from employees after a reported rumor that he was having an intimate relationship with someone in his organization. Hazel Aff., Paras. 7-9; Admissions Numbers 15, 18, Exs. 9 and 11.

10. On January 24, 2008, Nugent recommended that Murray be progressed from Tech Support Tech 2 to Tech Support Analyst 1. He wrote:

---

[2] Admissions refers to Defendant's First Request for Admissions, the attached exhibits, and Plaintiffs' responses which are attached to Defendant's motion for summary judgment.

[3] Nugent claims that the email was sent because of the actions of BCBS employee Susan Temples in inviting BCBS employees, including Murray, to a "sex toy" party (discussed further below). Nugent Aff., Para. 21. Hazel states that after she sent the email, Nugent and Murray came to her office to complain about Susan Temples. Hazel Aff., Para. 5. BCBS has produced an email from Murray dated November 10, 2007, which references the November 9, 2007 email from Hazel (sent at 12:52 p.m.), in which Murray states that she was approached by Susan Temples about the party at approximately 4:00 p.m. (i.e. after the email was sent) on November 9. Admissions Number 12, Ex. 6.

3

> Since moved to the corporate service desk, Kortney has excelled and become a key element on the desk...She is well respected by her team members and is a known leader on the floor. She acts as a back up in the absence of the manager.

Admissions Numbers 20 and 21, and Exs. 12 and 13. Later, however, Nugent complained to Hazel about Murray's performance. Admissions Number 22.

11. Nugent states that he stopped sending personal text messages to Murray in January or early February 2008 because: (1) he asked another female employee to get him a cup of coffee, Murray normally did this and she reacted very negatively and jealously when he asked the other employee to get him coffee; (2) there was a rumor he was having an affair with an employee; (3) Murray's flirting with Gainey and Nugent was taking a more serious tone; and (4) Murray's work performance was becoming an issue. Nugent Aff., Para. 7.

12. Gainey states that in late January or early February, at Nugent's suggestion, he ceased sending personal text messages to Murray. Gainey Aff., Para. 7.

13. On March 16 and 17, 2008, Murray reported to Hazel that she received sexual overtures from Nugent and Gainey, as well as an inappropriate visual message and inappropriate text messages which she showed to Hazel. Hazel contacted Phil Dunn ("Dunn"), the Director of TSC Incident Management for I/S. Dunn in turn involved Lonnie Emard ("Emard"), the Director of Staff Resource Management for I/S and Bonnie Kelly ("Kelly"), the Manager of the Staff Resource Management Area of I/S.[4] The matter was referred to Human Resources ("HR"). See Hazel, Dunn, Emard, and Kelly Affs.

---

[4]Dunn is a white male, Emard is a white male, and Kelly is a white female.

14. In discussions with Hazel, Emard, Kelley, and HR Manager Brenetta Richards ("Richards"),[5] Murray reported that Nugent and Gainey had engaged in inappropriate sexual discussions with her and suggested that sex with them would further her career. Hazel, Emard, Kelley, and Richards Affs. The investigators were shown the text messages Murray received that were confirmed to have come from the cell phones of Nugent and Gainey.[6] Richards Aff., Para. 2 and Attachment at 8; Hazel Aff.; Emard Aff.; Kelly Aff.

15. Both Plaintiffs were suspended from work without pay, while HR investigated the accusations of sexual harassment. Nugent Aff., Paras. 13-14; Gainey Aff., Paras. 9-10. The suspensions were later changed to be with pay. Gainey Aff., Para. 13; Nugent Aff., Para. 17.

16. Gainey wrote Hazel an email apologizing "for the dark cloud I have brought upon myself, the TSC management and the TSC." Admissions Number 34, Ex. 17. Nugent wrote an email apologizing to Hazel and Phil Dunn "for embarrassing the TSC, both of you, the help desk and my family." Admissions Number 35, Ex. 18.

17. During the investigation, Gainey told the HR representatives that the texting was all consensual and Murray had participated without complaint. He denied allegations of sexual

---

[5]Richards is a black female.

[6]The text and photo messages to Murray included:
December 13, 2007 from Nugent: A photo of a male dressed in a Santa suit with his genitalia exposed.
January 10, 2008 from Nugent: A text message stating "Sit on my face."
January 10, 2008 from Gainey: A text message stating "I want to lick ice cream off your booty."
January 11, 2008 from Gainey: A text message stating that he could "kick your ass for sending me to training" with someone.
January 23, 2008 from Nugent: A text message stating "Will I at least get to touch your tits."
January 23, 2008 from Nugent: A text message stating "do you like sucking balls."
January 24, 2008 from Gainey: A text message stating "I want to suck your areolas."
See Richards, Hazel, Emard, Kelly, and Dunn Affs.

5

harassment. Gainey Aff., Para. 9. Nugent told the HR representative that he had not engaged in any inappropriate or unwelcome sexual discussions with Murray and never suggested that sex with him would further her career. Nugent Aff., Para. 25.

18. Richards recommended termination of the employment of Nugent and Gainey based on violations of corporate policies. Richards Aff., Paras. 7-8 and attachment at 8. BCBS management, including Dunn, Canter, Miracle, Emard, and Kelly, concurred. Hazel Aff., Para.14; Dunn Aff., Para. 5; Jack Canter Aff., Para. 5; Myra Miracle Aff., Para. 5;[7] Emard Aff., Para. 5; and Kelly Aff., Para. 5.

19. On March 26, 2008, Plaintiffs were each notified by letter and phone call from Hazel that their employment had been terminated due to "unprofessional behavior in the workplace" in violation of BCBS corporate policies 65205 "Personal Conduct" and 65003 "Our Values." Nugent Aff., Para. 18; Gainey Aff., Para. 13; Admissions Exs. 21 and 22.

20. At the time of Plaintiffs' terminations, Murray was suspended pending discussions and investigation of the allegations against her. Upon return from her paid suspension, Murray was presented with a written counseling memorandum, was transferred to another team, and no longer served as a Team Lead. Soon thereafter, she resigned from BCBS. Hazel Aff., Para. 15; Admissions Ex. 23.

21. Plaintiffs filed Charges of Discrimination with the South Carolina Human Affairs Commission and with the United State Equal Employment Opportunity Commission ("EEOC") alleging violations of Title VII. On March 11, 2009, the EEOC issued a Notice

---

[7]Jack Canter is a white male. Myra Miracle is a white female.

of Right to Sue to Gainey and a separate Notice of Right to Sue to Nugent. Complaint, Paras. 6-8.

## MOTION TO STRIKE

Plaintiffs filed a motion to strike Defendant's new evidence and arguments. They ask that the Court strike the January 8, 2010 affidavit of Emard, and the January 11, 2010 affidavits of Hazel, Jennifer Richardson, and Samuel Nesbit. Plaintiffs request that the Court "strike all arguments related to this evidence raised for the first time in Defendant's Reply." Doc. 32 at 1. BCBS contends that the motion to strike should be denied because Plaintiffs fail to specify any new argument or issue allegedly raised by Defendant's reply and because their reply addresses new arguments by Plaintiffs.

Plaintiffs identify the affidavits they wish to have stricken, however, they have not identified the specific new evidence they request be stricken. BCBS submitted argument and affidavits which appear to be in response to new arguments raised by Plaintiffs in their response brief (to BCBS's motion for summary judgment). Even if these new affidavits are not considered, however, Plaintiffs fail to establish their claims for discrimination and defamation. The arguments and evidence presented by Plaintiffs which the response affidavits address is inadmissible hearsay (discussed further below). Thus, it is recommended that Plaintiffs' motion to strike be denied.

## MOTION FOR SUMARY JUDGMENT

Gainey and Nugent allege claims under Title VII for wrongful termination based on race and/or sex. They also assert a claim under South Carolina law for defamation.

A. Standard for Motion for Summary Judgment

When no genuine issue of any material fact exists, summary judgment is appropriate. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from

the evidence must be viewed in the light most favorable to the non-moving party. Id. Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir.), cert. denied, 484 U.S. 897 (1987). This does not mean that summary judgment is never appropriate in these cases. To the contrary, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits (see Fed. R. Civ. P. 56(e)), depositions, interrogatories, or admissions to demonstrate the

existence of a genuine and material factual issue for trial. Baber, citing Celotex Corp., supra. Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1316 (4th Cir. 1993) and DeLeon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1233 (4th Cir. 1989), n.7. Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Servs. Co., 80 F.3d 954 (4th Cir. 1996).

B. Title VII

Plaintiffs allege that female and black employees were subjected to lesser discipline for comparable offenses for which Plaintiffs were terminated by BCBS.[8] BCBS contends that Plaintiffs fail to establish a prima facie case; they have articulated legitimate, nondiscriminatory reasons for their actions; and Plaintiffs fail to show pretext.

---

[8]BCBS may be treating Plaintiffs' claims as ones for wrongful termination. Plaintiffs, however, assert that their claims should be analyzed under a disparate discipline framework. In their complaint they specifically assert that other similarly-situated females engaged in the same type behavior for which Plaintiffs were terminated, but they were not suspended or terminated. They also, apparently referring to Murray, claim that the "black female who alleged the sexual harassment was an instigator and willing participant in the behavior for which Plaintiffs were terminated; however, she was neither suspended nor terminated." Complaint, Para. 15. Additionally, Plaintiffs allege that "[t]his same black female who alleged the sexual harassment was herself accused of sexual harassment, but was not terminated." Complaint, Para. 16. Thus, the undersigned has treated Plaintiffs' Title VII claims as allegations of disparate discipline.

Under a wrongful termination framework, Plaintiffs fail to establish a prima facie case because they have not established the fourth prong of their prima facie case as they have not shown that the position was filled by a similarly qualified applicant outside the protected class or that other employees who are not members of the protected class were retained under apparently similar circumstances. See Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007), cert. denied, 552 U.S. 1102 (2008); Honor v. Booz-Allen & Hamilton, Inc., 383 F.3d 180, 188 (4th Cir. 2004).

9

In the absence of direct proof of a defendant's intent to discriminate,[9] a plaintiff can employ the scheme outlined in McDonnell Douglas v. Green, 411 U.S. 792 (1973) to establish a prima facie case of discrimination. McDonnell Douglas provides that, once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory basis for the challenged employment action. McDonnell Douglas, 411 U.S. at 802. If the employer provides the required evidence of a non-discriminatory reason for the action, the plaintiff must then show that the proffered reasons were not the true reasons for the employment action, but were a pretext for discrimination. Id. at 804; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).

BCBS argues that Plaintiffs have not established their prima facie cases because they have not shown that a similarly-situated employee outside their protected class was treated better than Nugent or Gainey after engaging in the same inappropriate behavior. To establish a prima facie case of disparate discipline, a plaintiff must show "(1) that plaintiff engaged in prohibited conduct similar to that of a person of another race, color, sex, religion, or national origin, and (2) that disciplinary measures enforced against the plaintiff were more severe than those enforced against the other person." Lightner v. City of Wilmington, N.C., 545 F.3d 260 (4th Cir. 2008), citing Moore v. City of Charlotte, 754 F.2d 1100, 1105-06 (4th Cir. 1985) (adapting the McDonnell Douglas framework for the employee discipline context).

Plaintiffs fail to establish a prima facie case of disparate discipline because they have not shown that they were disciplined more harshly than BCBS employees of another race and/or sex who engaged in similar prohibited conduct. When assessing the seriousness of misconduct, "precise

---

[9]Plaintiffs have not submitted any direct evidence of discrimination.

equivalence in culpability between employees is not the ultimate question ... comparison can be made in light of the harm caused or threatened to the victim or society, and the culpability of the offender." Moore v. City of Charlotte, NC, 754 F.2d 1100, 1107 (4th Cir.1985) (internal quotation marks and citations omitted). While exact symmetry between Plaintiff's situation or actions and those of others is not required, they must be materially similar." Id. (citing Moore, 754 F.2d at 1107). Furthermore, it is up to the trial court to assess the relative similarity of conduct or misconduct cited by the parties at the summary judgment stage. Id.; see also Moore, 754 F.2d at 1107 (noting that lower federal courts have the "difficult, but not unfamiliar, task of assessing the gravity of the offenses on a relative scale").

Plaintiffs allege that Murray was disciplined less severely for similarly serious offenses. They, however, fail to show that Murray's prohibited conduct was of similar seriousness to that of Nugent, who was her supervisor. Courts have found that the misconduct was not similarly serious where the plaintiff was a supervisory employee and the comparator was not. See Forrest v. Transit Mgmt. of Charlotte, Inc., 245 Fed. Appx. 255, 256 (4th Cir. 2007)("[W]hile Forrest did attempt to present testimony regarding an altercation between two non-supervisory employees, these individuals were not subject to the higher standard of performance that was applicable to Forrest as a supervisor."); Johnson v. Baltimore County, Maryland, No. WMN-08-CV-3162, 2010 WL 2545761 (D.Md. June 16, 2010)("As Plaintiff was a Lieutenant, the Court cannot compare the standards of performance expected of her versus standards expected of mere correctional officers.").

Plaintiffs also fail to show that Murray's prohibited conduct was of similar seriousness to that of Gainey. Although both Murray and Gainey were Team Leads, Gainey had previously been issued an Employee Corrective Action Report for sending an inappropriate electronic communication to a

11

co-worker. "The similarity between comparators ... must be clearly established in order to be meaningful." Lightner v. City of Wilmington, N.C., 545 F.3d 260, 265 (4th Cir. 2008).

Plaintiffs argue that Murray's conduct was similarly serious because they have presented evidence that Murray sent them text messages containing sexual content and that she sexually propositioned them. In support of this they have only submitted their own affidavits stating such. In contrast, Murray presented evidence to BCBS that Plaintiffs sent her inappropriate text messages, as outlined above. Plaintiffs also argue that Richardson's investigation revealed that Murray engaged in sexual harassment with other BCBS employees including rubbing her breasts against male employees on several occasions and rubbing her pelvis against a male employee on at least one occasion. See Attachment to Richardson Aff. (Confidential Memorandum to File from Richardson concerning sexual harassment allegations). These notes, however, do not identify the employees and there is no evidence that these employees ever complained of sexual harassment. Further, Nugent was Murray's supervisor. There is no evidence that he took any disciplinary action against her for her conduct of which he now complains. Additionally, there is no evidence of previous disciplinary action against her, unlike that against Gainey.

Plaintiffs allege that BCBS employee Josie Heilman ("Heilman") was disciplined less severely for similarly serious conduct. Nugent states that he is "aware" that Heilman was counseled and transferred to his work area after she behaved inappropriately at a luncheon with a BCBS manager, two instructors from Midlands Technical College, and other employees from her work area.[10] Heilman allegedly referred to a drinking straw as a penis and proceeded to make lewd comments and gestures utilizing the straw. Nugent Aff., Para. 24.

---

[10]There is no indication that either Gainey or Nugent was present at the luncheon.

Plaintiffs have only presented inadmissible hearsay evidence in support of their argument that Heilman engaged in similarly serious misconduct. Further, Emard states that he was unaware of the allegations about an incident with Heilman and a straw, does not recall ever hearing such allegations, and he tried to find a position for her elsewhere because she was struggling with the Entry Level Training Program ("ELTP") class (for which she was initially hired). Emard Reply Aff., Para. 8.[11] Hazel states that she does not recall hearing the straw allegations about Heilman. She says that Emard told her that Heilman was not meeting qualifications in the ELTP and recommended she consider Heilman for a position in her area. Hazel Supp. Aff., Para. 22. "[U]nless [the decisionmakers] knew of the [comparators' misconduct] the events cannot be considered in determining whether [plaintiff and his comparators] are similarly situated." Knight v. Baptist Hosp. of Miami, Inc., 330 F.3d 1313, 1317 n. 5 (11th Cir.2003); accord, Anderson v. WBMG-42, 253 F.3d 561, 567 n. 3 (11th Cir. 2001) (comparator's misconduct irrelevant where no evidence existed that middle manager brought misconduct to decisionmaker's attention); see also Brochu v. City of Riviera Beach, 304 F.3d 1144, 1156 (11th Cir.2002) ( "[N]either a court nor a jury may impute knowledge to a decision-maker who has sworn he had no actual knowledge."). Additionally, Plaintiffs fail to show that Heilman's alleged prohibited conduct was similarly serious to their prohibited conduct because they have not shown that she was a supervisor (Nugent) or that she was a Team Lead who had a prior corrective action (Gainey).

Plaintiffs also allege that BCBS employee Beth Snell ("Snell") was not disciplined for similarly serious conduct. On an unidentified date, Nugent claims that Hazel invited him into her

---

[11] Even Emard's affidavit and Hazel's supplemental affidavit are stricken, Plaintiffs have failed to present anything more than inadmissible hearsay evidence in support of their claim. Further, as discussed above, they fail to show that Heilman was similarly situated to them.

office where several employees under his supervision were gathered, including Snell. Snell told a story about some teenagers asking her advice on how to remove a condom that became stuck in the vagina of her son's friend. He asserts that "the females" (he does not identify the names) joked that the problem was a result of the small penis of the boy. Nugent states that he was embarrassed, said so, and left the office. Nugent Aff., Para. 24. There is no indication, however that Nugent (Snell's supervisor) took any action against her for the alleged incident. Plaintiffs fail to show that Snell's conduct was similarly serious because he has not shown that she was a supervisor (Nugent) or that she was a team lead who had a prior corrective action (Gainey).

Plaintiffs allege that Susan Temples ("Temples") was disciplined less severely for similarly serious conduct. At the office in November 2007, Temples invited work colleagues to an adult party (apparently involving the sale of sex toys) and mentioned the party in the office afterwards. Nugent Aff., Para. 21. After Murray complained to Hazel about the incident, Temples was issued an Employee Corrective Action Report for her conduct. Admission 13 and Ex. 7. Plaintiffs fail to show that Temples' conduct was similarly serious to that of Plaintiffs as she was not a supervisor (Nugent) and she was not a Team Lead who had been issued a prior corrective action (Gainey).

C. <u>Defamation</u>

Plaintiffs allege that "Defendant's actions and conduct following Plaintiffs' suspensions caused it to be well known in the workplace that Plaintiffs had been suspended for alleged sexual harassment." Complaint, Para. 30. They also assert that "Defendant's termination of Plaintiffs coupled with its actions and conduct following Plaintiffs' termination caused the perception in the workplace that Plaintiffs had in fact engaged in unlawful sexual harassment." Complaint, Para. 31. Plaintiffs argue that they were not terminated for unlawful sexual harassment

14

and did not engage in unlawful sexual harassment. Complaint, Para. 32. BCBS contends that Plaintiffs fail to establish a claim for defamation because: (1) any statements regarding the sexual harassment allegations and subsequent investigation were true; (2) Nugent and Gainey told employees about the sexual harassment allegations against them; and (3) any statement made by BCBS regarding Murray's allegations and the investigations are protected by a qualified privilege that BCBS did not exceed. Plaintiffs deny that they told other employees about the sexual harassment allegations against them, but do not contest BCBS's first and third assertions above. They assert that it was well known that they were suspended based on sexual harassment allegations, yet they were not terminated for sexual harassment, and BCBS by its actions and conduct falsely published to employees that they were terminated for sexual harassment. In support of this, they argue that at least two employees heard from management that they were terminated for sexual harassment.

The tort of defamation allows a plaintiff to recover for injury to his or her reputation as the result of the defendant's communications to others of a false message about the plaintiff. Holtzscheiter v. Thomson Newspapers, Inc., 506 S.E.2d 497, 501 (S.C. 1998). Defamatory communications take two forms: libel and slander. Slander is a spoken defamation while libel is a written defamation or one accomplished by actions or conduct. Id. If a communication is libelous, then the law presumes the defendant acted with common law malice. Id. Under South Carolina law, to state a cause of action for defamation, a plaintiff must show the existence of some message that (1) is defamatory, (2) is published with actual or implied malice, (3) is false, (4) is published by the

defendant, (5) concerned the plaintiff, and (6) resulted in legally presumed or in special damages.[12] Parker v. Evening Post Pub. Co., 452 S.E.2d 640, 644 (S.C. Ct. App. 1994), cert. denied, 516 U.S. 1172 (1996). Defamation need not be accomplished in a direct manner. Eubanks v. Smith, 354 S.E.2d 898 (1987); Tyler v. Macks Stores, 272 S.E.2d 633 (1980). A mere insinuation is actionable as a positive assertion if it is false and malicious and its meaning is plain. Id.

Plaintiffs fail to establish a claim for defamation because they have not shown that BCBS "published" (either by words or conduct) that Gainey and Nugent were terminated for sexual harassment.[13] Plaintiffs appear to argue that this statement was published because BCBS conducted sexual harassment training with employees a couple of weeks after Plaintiffs' terminations and because at least two employees heard from management that Gainey and Nugent were terminated for sexual harassment. In support of this, they provide that: (1) Gainey states that an unidentified manager allegedly told Samuel L. "Bo" Nesbit ("Nesbit") that Plaintiffs were terminated for sexual harassment and Nesbit relayed the statement to Gainey, and that (2) Jennifer Richardson ("Richardson"), a manager in the I/S Department who was Gainey's sister-in-law, held an "understanding from Loretta [Hazel] that Donald and I were terminated for sexual harassment."

---

[12]An allegedly defamatory statement can either be "actionable per se" or "not actionable per se." Holtzcheiter, 506 S.E.2d at 510. A statement that is actionable per se does not require proof of special damages. Id. A statement that is not actionable per se cannot support a defamation claim without evidence of "tangible losses or injury to the plaintiff's property, business, occupation or profession, capable of being assessed monetarily." Id. All libel is actionable per se, but slander is only actionable per se if it relates to one of the following five categories: (1) the commission of a crime of moral turpitude; (2) the contraction of a "loathsome disease"; (3) adultery; (4) lack of chastity; and (5) "unfitness in one's business or profession." Id. at 501. Whether a statement is actionable per se is a matter of law for the court. Id. at 510.

[13]It is alternatively recommended, pursuant to 28 U.S.C. § 1367(c)(3), that the remaining state law claims be dismissed. If the recommendation that summary judgment be granted as to Plaintiffs' federal claims is adopted, only state law claims would remain.

Gainey Aff., Paras. 14-15. Nesbit, however, states that although Temples (a nonsupervisory employee) told him that Gainey were no longer employed because of sexual harassment allegations against him, no manager told him the reasons for Plaintiffs' discharge. He also states that before Plaintiffs' discharge he was unaware of sexual harassment allegations against them, and Gainey told him that Murray filed charges of sexual harassment against Gainey and Nugent because of sexual text messages. Nesbit Aff., Paras. 2-4. Richardson states that she was interviewed as part of the investigation into Murray's allegations of sexual harassment; Gainey told her some of the specific details of the allegations and apologized to her for his involvement in the situation; she does not remember any person telling her the specific reason for their discharge, but she assumed it was related to Murray's sexual harassment allegations; and after Plaintiffs' terminations, the I/S Department participated in sexual harassment training, no one said the training was related to the allegations against Plaintiffs, although she assumed it was. Richardson Aff., Paras. 4-7.[14]

## CONCLUSION

Based on the foregoing, it is recommended that Plaintiffs' motion to strike (Doc. 32) be **denied** and that Defendant's motion for summary judgment (Doc. 25) be **granted**.

Joseph R. McCrorey
United States Magistrate Judge

August 9, 2010
Columbia, South Carolina

---

[14] Even if the court were to strike the affidavits of Nesbit and Richardson submitted with BCBS's reply memorandum, the result would be the same because Plaintiffs have presented nothing other than Gainey's hearsay statements to support their allegations.

17